NOT FOR PUBLICATION                                            (Doc. No. 93)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                                      :
K & G MEN'S COMPANY, INC.,                            :
                                                      :
            Plaintiff,                                :       Civil No. 06-5768 (RBK-AMD)
                                                      :
            v.                                        :       **OPINION**
                                                      :
LOUDMILA KIBALKO, and L & N                           :
INDUSTRY, INC.,                                       :
                                                      :
            Defendants/Third-Party                    :
                        Plaintiffs,                   :
                                                      :
            v.                                        :
                                                      :
RITE TECH INDUSTRIAL CO. LTD,                         :
EUNSUNG ELECTRIC CO., LTD.,                           :
                                                      :
            Third-Party Defendants.                   :
_____:
                                                      :
EUNSUNG ELECTRIC CO., LTD,                            :
                                                      :
            Third-Party Defendant/                    :
            Second Third-Party Plaintiff,  :
                                                      :
            v.                                        :
                                                      :
TOWER MANUFACTURING CORP.,                            :
TOWER SWITCHES LIMITED,                               :
HUANGBO PO WAH ELECTRICAL                             :
MANUFACTORY, DONG-YANG                                :
ELECTRONICS, CO., LTD.                                :
                                                      :
            Second Third-Party                        :
            Defendants.                               :
_____:

1

**KUGLER**, United States District Judge:

This matter comes before the Court upon a motion by Second Third-Party Defendants Tower Manufacturing Corporation and Tower Switches Limited (collectively, the "Tower Entities") for summary judgment as to the Second Third-Party Complaint filed against it by Eunsung Electronics Co., Ltd. ("Eunsung"), which alleges negligence, strict liability, and breach of implied warranty, as well as the cross-claims asserted against the Tower Entities by Loudmila Kibalko, L & N Industry, Inc., and Rite Tech Industrial Co. LTD.  For the reasons expressed below, the Court will grant the Tower Entities' motion.

**I.    BACKGROUND**

This matter arises out of a fire that occurred at a K & G Fashion Superstore in Cherry Hill, New Jersey and the subsequent efforts by a number of parties to get to the bottom of whom and what caused it.  As the parties are familiar with the factual background of this matter, the Court will only briefly recount the facts necessary for this Opinion.

On July 8, 2006 , a fire was discovered in the tailor shop located in the rear of the K & G Fashion Superstore, which was leased by Loudmila Kibalko and her solely owned business, L & N Industry, Inc. (collectively, "Kibalko").  Fire Investigator James T. Bird of the Camden County Fire Department investigated the fire and discovered a steam iron in the tailor shop that had been severely damaged by the fire.  Ms. Kibalko was the only person working in the tailor shop on the evening of July 7, 2006.  Before leaving the tailor shop that night, Ms. Kibalko contends that she placed the iron on a silicon-coated rest and turned it off, as was her practice, by switching off the power strip into which the iron was plugged.

On or about September 20, 2006, K & G Men's Company, Inc. ("K & G") filed a

2

Complaint against Kibalko in New Jersey Superior Court alleging that Ms. Kibalko negligently caused the fire by, inter alia, failing to properly turn off the iron.  On December 1, 2006, Kibalko removed the matter to this Court.  On December 7, 2006, Kibalko counterclaimed against K & G for providing it with an allegedly defective power strip,[1] and filed a Third-Party Complaint against the power strip's manufacturer, Rite Tech Industrial Co. LTD. ("Rite Tech"), sounding in negligence, strict liability, and breach of implied warranty.  On May 8, 2007, Rite Tech cross-claimed for contribution and indemnification against all present and future parties.  With permission of court, Kibalko filed an additional Third-Party Complaint against Eunsung, the manufacturer of the iron, on September 18, 2007.  Eunsung responded by filing counter-claims against Kibalko and a cross-claim against Rite Tech.  Eunsung also filed a Second Third Party Complaint against the Tower Entities, which sold and/or manufactured the iron's thermostat, as well as against two foreign corporations, Huangbo Po Wah Electrical Manufactory and Dong-Yang Electronics Co., Ltd, who allegedly manufactured and sold the iron's thermostat and thermal fuse, respectively.  On May 9, 2008, Kibalko cross-claimed for contribution and indemnification against all co-defendants.

On July 9, 2009, Tower Entities moved for summary judgment with respect to the claims alleged against them in Eunsung's Second Third-Party Complaint as well as the cross-claims of Kibalko and Rite Tech.  On August 3, 3009, Eunsung replied by way of a brief letter to the Court.[2]  Kibalko and Rite Tech filed no opposition.  With leave of court, the Tower Entities filed

---

[1]  Kibalko's counterclaim against K & G has been dismissed with prejudice pursuant to stipulation.

[2]  The letter was not timely filed in conformity with Local Civil Rule 7.1(d)(2), and Eunsung did not request permission to file an untimely opposition.

3

a reply brief on August 10, 2009.  Accordingly, the matter is ripe for consideration.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material

fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.

Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986).  When the Court weighs the evidence

presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir.

1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the

absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district

court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477

U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out

specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving

party must "do more than simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to

survive summary judgment, the nonmoving party must "make a showing sufficient to establish

the existence of [every] element essential to that party's case, and on which that party will bear

the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary

judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 Fed. Appx. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

The Tower Entities ague that they are entitled to summary judgment because none of the experts retained by any of the parties have opined that the thermostat was defective, malfunctioned, or caused the fire and that the claims against it cannot survive without such expert testimony. Eunsung does not necessarily disagree. It is Eunsung's position that there is no admissible expert testimony demonstrating that there was a defect or malfunction of the iron. Accordingly, Eunsung believes that summary judgment is appropriate for both the Tower Entities as well as for itself.[3] In the alternative, however, Eunsung takes the position, that if the iron had a defect or malfunctioned causing it to overheat and start a fire, it could only have been caused by a defect or malfunction of the thermostat. As a consequence, Eunsung argues that summary judgment for Eunsung is a prerequisite to summary judgment for the Tower Entities.

---

[3] Eunsung filed a separate motion for summary judgment on July 10, 2009. Eunsung's motion is not presently before the Court.

To prevail on its strict liability claim, Eunsung must demonstrate that (1) the thermostat was defective; (2) the defect existed when the thermostat left the Tower Entities' control; and (3) the defect proximately caused injury to a reasonably foreseeable user.  See Delaney v. Stryker Orthopaedics, No. 08-3210, 2009 WL 564243, *6 (D.N.J. Mar. 5, 2009) (citing Myrlak v. Port Auth. of N.Y. & N.J., 723 A.2d 45, 52 (1999)); Estate of Knoster v. Ford Motor Co., No. 01-3168, 2008 WL 5416399, at *2 (D.N.J. Dec. 22, 2008) (citing Myrlak, 723 A.2d at 52).  To prevail on its negligence and breach of implied warranty claims, Eunsung must show, inter alia, that the thermostat caused the fire.  See Rutigliano v. Valley Business Forms, 929 F. Supp. 779, 783 (D.N.J. 1996) (citing Habecker v. Copperloy Corp., 893 F.2d 49, 54 (3d Cir. 1990); Restatement (Second) of Torts § 430 (1965)); In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig., No. 08-663, 2008 WL 5451024, at *6 (D.N.J. Dec. 31, 2008) (citation omitted).

A product is defective where "it is not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it is sold."  Myrlak, 723 A.2d at 52.  A plaintiff may ordinarily prove a defect in one of three ways, namely by offering (1) direct evidence (such as an examining expert's testimony); (2) circumstantial evidence (such as proof of proper use, handling, and operation of the product); or (3) evidence that negates other causes of the product failure for which the defendant would not be responsible.  Id. at 52, 53 (citing Scanlon v. Gen. Motors Corp., 326 A.2d 673 (N.J. 1974); Manieri v. Volkswagenwerk A.G., 376 A.2d 1317 (N.J. Super. Ct. App. Div. 1977)).  Where a plaintiff cannot prove a specific product defect, a product defect may be proved by using "a res ipsa loquitur-like inference, known as the 'indeterminate product test,'" that is available where the harmful incident (1) "was of a kind that ordinarily occurs as a result of a product defect"; and (2) "was not, in the particular case, solely the result of causes

6

other than product defect existing at the time of sale or distribution."  <u>Estate of Knoster</u>, 2008

WL 5416399, at *3-*4 (quoting <u>Myrlak</u>, 723 A.2d at 55-56).

      However, "where the allegedly defective product involves a complex instrumentality, a

plaintiff is required to provide expert testimony."  <u>Lauder v. Teaneck Volunteer Ambulance</u>

<u>Corps</u>, 845 A.2d 1271, 1277 (N.J. Super. Ct. App. Div. 2004) (citing <u>Rocco v. N.J. Transit Rail</u>

<u>Operations</u>, 749 A.2d 868 (N.J. Super. Ct. App. Div. 2000)).  In such cases, expert testimony is

required to "assist the fact finder in understanding 'the mechanical intricacies of the

instrumentality' and in excluding other possible causes of the accident."  <u>Id.</u> (quoting <u>Jimenez v.</u>

<u>GNOC Corp.</u>, 670 A.2d 24 (N.J. Super. Ct. App. Div. 1996)).  For example, the Appellate

Division has required a plaintiff to produce expert testimony to prove that a railroad car's

emergency unlocking mechanisms was defectively designed where the plaintiff's hand was

jammed in the car's sliding doors and the emergency mechanism failed to open the doors.  <u>See</u>

<u>Rocco</u>, 749 A.2d at 868.

      In this case, Eunsung, Kibalko, and Rite Tech require expert testimony to prove that the

iron's thermostat was defective, malfunctioned, and caused the fire.  Although the average juror

is likely to have experience with irons, such a juror is unlikely to understand the intricacies of an

iron's internal operation.  <u>See State Farm Fire & Cas. Co. v. Kaz, Inc.</u>, 2008 WL 2122639, at *4

(N.J. Super. Ct. App. Div. May 22, 2008) (per curiam) (unpublished opinion) (observing that the

electrical wiring of an appliance is not within the ordinary knowledge of the jury); <u>see also</u>

<u>Laramee v. Warn Indus., Inc.</u>, No. 99-c-50337, 2004 WL 1611790, at *5 (N.D. Ill. July 19, 2004)

(mem.) ("Electrical engineering principles are generally beyond the average juror (and many

lawyers).").  Although Eunsung and the Tower Entities agree that the iron did not cause the fire,

7

as discussed more fully below, other experts in the case believe that it did.  Thus, if the jury finds

that the iron caused the fire, it will have to determine whether a defectively designed or

malfunctioning thermostat caused the iron to overheat or whether the iron overheated for some

other non-thermostat related reason.  Because most jurors are unlikely to posses an understanding

of the inner-workings of a commercial steam iron and to know the circumstances under which

such an iron could cause a fire, expert testimony will be necessary to assist jurors in assessing

defect and causation.

Having established the necessity of expert testimony, the question remains whether there

exists any admissible expert evidence that the thermostat was defective, malfunctioned, and

caused the fire.  To carry their initial burden, the Tower Entities contend that the none of the

many experts involved in this case have concluded that the thermostat was defective, (see, e.g.,

Tower Entities' Rule 56.1 Statement ¶¶ 12, 15, 21, 32), and that experts retained by both

Eunsung and the Tower Entities have affirmatively concluded that the thermostat was not

defective and did not malfunction or cause the fire, (see, e.g., id. ¶¶ 13, 23, 24, 26, 27, 28).

A review of the record supports the Tower Entities' factual contentions.  Fire Investigator

Bird examined the aftermath of the fire and subsequently authored a Fire Investigation Report.

The report concluded that the fire was caused by a power strip failure that allowed the iron to

heat to the ignition point of combustible materials on the table.  The report does not conclude

that the thermostat was defective, malfunctioned, or caused the fire.

On February 27, 2009, the parties (except Rite Tech) exchanged expert reports.  K & G's

causation expert, Electrical Engineering Consultant Michael Wald, concluded that the fire was

caused by improper use of the iron, to wit, misplacement of the iron on the stand as well as

failing to turn off the power strip into which the iron was plugged.  K & G's origin and cause

expert, Certified Fire and Explosion Investigator, James McKendrick, concluded that the fire

originated on top of the table, igniting the table-top padding and causing burning material to fall

to the floor and ignite combustibles stored beneath the table.  Neither report concludes that the

thermostat was defective, malfunctioned, or caused the fire.

Kibalko's causation expert, Professional Engineer Terrence L. DuVall, concluded that

both the iron and the power strip were faulty and caused the fire.  Mr. DuVall believes that the

power strip continuously energized the iron despite being placed in the "off" position by Ms.

Kibalko.  Mr. DuVall bases this continuous energy theory on the fact that the exposed wiring of

the severed power cord produced electrical arcing when Fire Investigator Bird accidentally

brushed it against a metal surface in conjunction with Fire Investigator Bird's observation that

the power strip was in the "off" position.  Analogizing to "a toilet that keeps running," Mr.

DuVall insinuates that the power strip switch may have been stuck in between the "on" and "off"

positions.  As to the iron, Mr. DuVall believes that it reached temperatures in excess of

Underwriters Laboratories ("UL")  standards, that the iron stand was inadequately built to

withstand the iron's surface temperature, that the iron's electrical cord violated UL standards,

and that the internal condition of the iron's wiring suggests that a short-circuit caused a bypass of

the iron's temperature control.  Mr. DuVall's report does not conclude that the thermostat was

defective, malfunctioned, or caused the fire.

Kibalko's origin and cause expert, Fire Consultant Patrick J. McGinley III, concluded that

the fire was caused by heat from the iron igniting available combustible materials such as the

tablecloth.  Mr. McGinley believes that the fire originated on top of the pressing table and

progressed to storage materials beneath the table.  Mr. McGinley supports his conclusion, in part, with the observation that there is a distinct iron-shaped burn mark on both the iron rest and the wooden tabletop.  Mr. McGinley's report does not conclude that the thermostat was defective, malfunctioned, or caused the fire.

The Tower Entities' causation expert, Dr. Andrew J. Neuhalfen, concluded that neither the iron nor the thermostat caused the fire.  In Dr. Neuhalfen's estimation, there was no evidence that the iron (notwithstanding the power cord), the thermostat, or the power strip malfunctioned.  Conversely, Dr. Neuhalfen could not rule out the iron's power cord as the cause of the fire.  He opined that the electric cord was faulty and appeared to have been altered.  He also observed that the fire did not originate in the location of the iron, but rather from the area between the fabric covered table and the sewing machine.

Pursuant to the Court's Order of March 25, 2009, the parties produced rebuttal reports.  Mr. Wald's report for K & G refutes Dr. Neuhalfen's power cord origination theory by noting that the sort of power cord failure described by Dr. Neuhalfen would have tripped the power strip's circuit breaker (which Mr. Wald contends was not tripped until after the fire) and that the small bits of arcing as are evidenced on the cord were insufficient to start a fire.  Mr. Wald's report also discredits the proposition that one can determine that a thermostat is properly functioning by visually examining it.  Nonetheless, Mr. Wald does not opine that the thermostat was, in fact, defective, malfunctioned, or caused the fire.  Furthermore, Mr. Wald discredited Mr. DuVall's theory that the power strip's circuit breaker was defective by observing that the power strip's on/off switch operated by way of a "snap-action" mechanism that rendered it virtually impossible to be in an indeterminate position.  Finally, Mr. Wald refuted the assertion that the

iron was defective simply because it did not comply with UL standards because such standards apparently apply to consumer appliances, not necessarily industrial equipment.

Eunsung produced the report of origin and cause expert, Paul J. Boerner of Flashpoint Investigative Services.  Based on certain burn patterns and charring characteristics, Mr. Boerner concluded that the fire originated under the table when the stored materials were ignited and that the iron's power cord could not be eliminated as a potential source of ignition.  Mr. Boerner's report does not conclude that the thermostat was defective, malfunctioned, or caused the fire.

Eunsung also produced the report of another origin and cause expert, Jamie L. McAllister of Combustion Science & Engineering.  Ms. McAllister ruled out the possibility of a fire originating on top of the table, in part by observing that the iron, operating under normal conditions, does not produce enough heat to ignite the combustibles with which the iron was in contact.  Ms. McAllister found no defects in the manufacture or design of the iron and no physical evidence to support a failure of the thermostat.  Ms. McAllister could not rule out the possibility that the fire originated underneath the table as a consequence of its faulty power cord.

The Tower Entities produced the rebuttal report of their causation expert, Dr. Neuhalfen. This report re-asserted Mr. Neuhalfen's conclusions that neither the iron nor the thermostat were faulty and that neither caused the fire.  Dr. Neuhalfen concluded that the fire was caused by the defective, altered power cord.  The Tower Entities also produced the report of their origin and cause expert, Certified Fire Investigator Robert J. Lucas.  Mr. Lucas concluded that the power cord was the most likely cause of the fire by observing that the damage to the power cord was more severe than to the iron and surrounding areas.  Mr. Lucas did not conclude that the thermostat caused the fire.

11

Finally, Rite Tech produced the report of its causation expert, Dale Benedick.  Mr. Benedick concluded that the power strip did not contribute in any way to the fire.  He relied on the post-fire electrical tests conducted on the power strip that produced normal results and that showed that the electrical and mechanical components of the power strip were fully intact and operational.  Mr. Benedick opined that Ms. Kibalko's failure to comply with the iron's user instructions caused the fire.  Foremost amongst these instructions, in Mr. Benedick's view, is the requirement that the power cord and silicone hose be secured with an S-type plastic holder.  Mr. Benedick believes that failure to do so likely facilitated damage to the electrical insulation and conductors in the power cord and that the power cord likely caused the fire.  Mr. Benedick also opined that Ms. Kibalko's failure to turn off the iron contributed to the fire.  Mr. Benedick's report does not conclude that the thermostat was defective, malfunctioned, or caused the fire.

In May and June of 2009, Mr. Wald, Mr. DuVall, Mr. Benedick, Ms. McAllister, Mr. Boerner, Dr. Neuhalfen, and Mr. Lucas were deposed, and none testified or opined that the thermostat was defective, malfunctioned, or caused the fire.  (Tower Entities' Rule 56.1 Statement ¶¶ 21, 32.)

The only evidence to which Eunsung points that could potentially create a genuine issue is the initial report of its expert, Professional Engineer Roger Boyell, dated February 26, 2009.  In this report, Mr. Boyell was asked to "assume for the purpose of the report that the iron caused the fire and to determine what component(s) of the iron may have failed to make the iron overheat." (February 26, 2009 Boyell Report at 1) (emphasis in the original).  Under this assumption, Mr. Boyell concluded that "if the iron got excessively hot, this could be due only to a defective or malfunctioning thermostat."  (Id.)  Mr. Boyell reasoned that the thermostat is the

only component of the iron responsible for temperature control.[4]

Mr. Boyell's February report does not affirmatively conclude that the thermostat at issue in the case was defective, malfunctioned, or caused the fire.  In this respect, Mr. Boyell's February report is consistent with all of the other expert opinion in the case, none of which concludes that the thermostat was defective, malfunctioned, or caused the fire.  Moreover, neither Eunsung, Kibalko, nor Rite Tech have opposed the Tower Entities' assertion that none of the experts testified or opined that the thermostat was defective, malfunctioned, or caused the fire.  Thus, the matter should be deemed admitted.  See L. Civ. R. 56.1.

Even if the Court accepted Eunsung's reference to Dr. Boyell's conditional conclusion in their untimely letter response as the responsive opposition to the Tower Entities' Rule 56.1 statement required by local rule, it would not provide a basis for withstanding the instant motion. In April of 2009, Mr. Boyell produced another report for Eunsung, wherein he addressed the issue his February Report was required to assume, namely whether the iron caused or contributed to the fire.  Mr. Boyell concluded that the iron was not defective and did not malfunction or cause the fire.[5]  He also expressly ruled out a defect or malfunction of the thermostat.  The report

---

[4] As Mr. Boyell's report explains, the iron contains two electrical circuits, one of which regulates water flow and one of which regulates heat.  The iron does not have a separate overheat limit or temperature cutoff.   The circuit that regulates heat does so thermostatically; the thermostat is an electric switch that closes its circuit to allow current to flow to the heater until the iron reaches a set temperature, and then opens to interrupt current and allow the heater to cool.  During normal operation, the temperature of the iron oscillates slowly around the setting, as the thermostat closes and opens.

[5] He observed that the electrical resistance of the damaged iron was measured at 14.4 ohms, which at 120 volts corresponds to a dissipation of 1000 watts, which apparently constitutes performance as rated.  Mr. Boyell also performed experiments with an exemplar iron during which the iron, at maximum setting, did not exceed 165 degrees Celsius, which apparently is far less than the maximum temperature permitted by UL.

explains that the thermostat could not have malfunctioned because a thermostat overheats when the electrical contacts that regulate the flow of electricity get stuck, and his examination of the instant thermostat's contact surfaces revealed no pitting or beading or other markings indicative of sticking.[6]  Thus, as Mr. Boyell confirmed at his deposition, the conditional conclusion expressed in his February report no longer reflects his professional opinion and requires revision.[7]

To be admissible, expert testimony must be reliable, relevant, and offered by one with specialized expertise.  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994); Federal Rule of Evidence 702).  A reliable opinion is "based on the 'methods and procedures of science' rather than on 'subjective beliefs or unsupported speculation'; the expert must have 'good grounds' for his or her belief.'"

---

[6]  Mr. Boyell concluded that the iron's power cord caused the fire.  He came to this conclusion by examining numerous photographs and x-rays of the power cord, by which process he found evidence that the cord had been previously damaged and repaired, in one place by cutting away the sheath and splicing exposed conductor ends together by twisting.  Mr. Boyell opined that when the iron was left under power and at a maximum temperature overnight, the thermostat drew power through the damaged and improperly mended cord, causing the weakened portions to overheat and ignite the combustibles where the cord was hanging.

[7]  Q:   Is it also possible that if the iron . . . got excessively hot, it could [] also [be] due to a scenario in which the thermostat was bypassed; is that true?

A:   Yes.

Q:   Given that you agree with that statement, your [conditional conclusion] should be revised, right . . . ?

A:   Yes.  I had not included the possibility of tampering.  I addressed a defect in the iron.  If the thermostat had been bypassed, that would have been a different scenario entirely.

(Dep. of Roger Boyell at 142:18-143:9.)

14

In re Paoli R.R. Yard PCB Litig., 35 F.3d at 742 (quoting Daubert v. Merrell Dow Pharma., Inc.,

509 U.S. 579 (1993)).  The focus of the reliability inquiry is on the expert's methodology, not his

or her conclusions, and "the issue is whether the evidence should be excluded because potential

flaws are large enough that the expert lacks good grounds for his or her conclusion." Hurd v.

Yaeger, No. 3:06cv1927, 2009 WL 2516874, at *4 (M.D. Pa. Aug. 13, 2009) (citing In re Paoli

R.R. Yard PCB Litig., 35 F.3d at 746).  As a consequence, "an 'expert's testimony must be

accompanied by a sufficient factual foundation before it can be submitted to the jury.'" Id. (citing

Elcock, 233 F.3d at 754).  Likewise, a relevant opinion is one that "fits" the subject matter at

issue such that it assists the trier of fact to understand the evidence or determine a fact in issue.

Id. (citing Daubert, 509 U.S. at 591; Schneider ex rel Est. of Schneider v. Fried, 320 F.3d 396,

405 (3d Cir. 2003)).  "Admissibility thus depends in part upon 'the proffered connection between

the scientific research or test result to be presented and particular disputed factual issues in the

case.'" Oddi v. Ford Motor Co., 234 F.3d 136,145 (3d Cir. 2000) (quoting In re Paoli R.R. Yard

PBC Litig., 35 F.3d at 743)).

　　　　Mr. Boyell's conditional conclusion – when read in context with his subsequent report

and deposition – can stand for little more than the following:  The iron is not defective and did

not overheat.  But if that conclusion is wrong, the thermostat may have been the cause because

thermostats are responsible for regulating temperature.  On the other hand, the thermostat might

not have been the cause because it is also possible for an iron to overheat without involvement of

the thermostat – such as by thermostat bypass due to defective wiring – and an examination of

this particular thermostat revealed none of the signs indicative of thermostat malfunction.

　　　　Expert testimony along the aforementioned lines is highly speculative and unlikely to

simplify or otherwise facilitate the jury's task.  See Feit v. Great-West Life & Annuity Ins. Co.,

460 F. Supp. 2d 632, 637 (D.N.J. 2006) (quoting Heller v. Shaw Indus., Inc., 167 F.3d 146, 152

(3d Cir. 1999) (noting that "a court must engage in a limited review of an expert's conclusions

'in order to determine whether they could reliably flow from the facts known to the expert and

the methodology used'"); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d

584, 608 (D.N.J. 2002) (quoting General Elec. Co. v. Joiner, 552 U.S. 136 (1997) (noting that

courts need not "admit opinion evidence that is connected to existing data only by the ipse dixit

of the expert.  A court may conclude that there is simply too great an analytical gap between the

data and the opinion proffered").  The Court therefore finds that Dr. Boyell's conditional

conclusion expressed in his February report is inadmissible, and cannot shield Eunsung from

summary judgment.[8]

   Eunsung's contention that summary judgment for Eunsung is a prerequisite for summary

judgment for the Tower Entities is simply not correct.  Eunsung's pending motion for summary

---

[8] An in limine hearing is not necessary on the limited issue of whether the conditional
conclusion contained in Mr. Boyell's February report is admissible under Federal Rule of
Evidence 702 and Daubert.  Although in limine hearings are, generally speaking, the preferred
method for resolving questions of expert evidence admissibility, they are not required in every
instance.  See Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999) (citing Cortes-
Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 188 (1st Cir. 1997)).  A hearing is
required, for example, where the court excludes an expert's conclusions on the grounds that they
are "insufficiently explained and the reasons and foundations for them inadequately and perhaps
confusingly explicated."  Id.  On the other hand, where the evidentiary record is substantial or the
court has before it the information necessary to determine that the expert lacks "good grounds"
for his conclusions, an in limine hearing may be unnecessary.  Oddi v. Ford Motor Co., 234 F.3d
136 (3d Cir. 2000).  Here, Mr. Boyell's February report is not confusing as his conclusion and
reasoning are clearly and succinctly stated.  Moreover, the development of the record through
Mr. Boyell's subsequent report and deposition testimony makes clear that his initial conditional
conclusion is no longer based on good grounds.  As a consequence, an in limine hearing is
unnecessary.

judgment is predicated on the argument that the Court should strike the testimony of Kibalko's causation expert, Mr. DuVall, who concluded that the iron contained fire-related defects and contributed to causing the fire. The Court's eventual disposition of Eunsung's motion will not alter the fact that Eunsung has not come forward with admissible expert evidence that the thermostat was defective, malfunctioned, or caused the fire. Without this evidence, Eunsung cannot prevail on any of its claims against the Tower Entities.

In sum, the Court will grant the Tower Entities' motion for summary judgment. To prove that the thermostat was defective, malfunctioned, and caused the fire, the non-moving parties must present expert testimony. None of the experts in the case have concluded that the thermostat was defective, malfunctioned, or caused the fire; whereas, several have affirmatively concluded that the thermostat was not defective, did not malfunction, and did not cause the fire. This is so despite Dr. Boyell's preliminary, conditional conclusion that if the iron overheated, it could only be due to a defective thermostat. Dr. Boyell has since backed-away from this opinion and admits it needs revision. He does not agree with the assumption that the iron overheated. He does not agree that the thermostat was defective, malfunctioned, or caused the fire. Perhaps most importantly, he no longer asserts that the only possible cause of an overheating iron is a defective thermostat. His conditional conclusion therefore is highly speculative and unhelpful. Without this evidence, the non-moving parties have no evidence supporting a defect in the thermostat or that the thermostat caused the fire. Accordingly, the Tower Entities are entitled to summary judgment.

**IV.   CONCLUSION**

For the reasons expressed above the Court will grant the Tower Entities' motion for

summary judgment against Eunsung, Kibalko, and Rite Tech.  An appropriate Order shall enter.

Dated: 5-12-2010                                    /s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge

18